Good morning. My name is John Curtis. I'm the attorney for the plaintiffs below. They were Stacey Smith and Aimee Lespron. Stacey and Aimee were preschool-age teachers at Defendant Tutor Time in 2009. They became pregnant in the mid to late spring of 2009 and over the course of the summer. Their hours were reduced ultimately in late August and early September. They essentially got no hours. Ms. Smith was placed on call and didn't get called for two weeks and Ms. Lespron had just several hours a day of work, such that her work actually didn't even cover her daycare. So she was essentially So the district court found or concluded that the evidence that you presented was insufficient to meet the fourth element of the prima facie case. That's correct, Your Honor. Where did the district court go wrong? The district court went wrong, we think, in at least two places. That identified the incorrect legal standard that essentially placed the burden on the plaintiff to articulate a non-discriminatory argument for the reduction in hours. Essentially requiring the plaintiff to identify that the reason was the drop-off in children at the school and that they had poor attendance problems. And then required the plaintiffs to develop evidence to compare themselves to not just preschool-age teachers who weren't pregnant, but preschool-age teachers who weren't pregnant who also had attendance problems. And we think that that was the incorrect legal standard. Well, what's wrong with the comparative group identified by the district court?  Yeah. So you're comparing pregnant employees, I guess, who had attendance problems compared with non-pregnant employees. Right. We asserted below that it should be a comparison of preschool-age teachers who were not pregnant to preschool-age teachers who were pregnant. And we think that the legal standard, I think there was a fact there, and there was a legal standard problem. You don't have to have identical comparity, but you have to have some similarity. That's correct. The standard is similar in all material respects. So I think the question is, what is material? Is the attendance problems material or is it not material? And what we would say is that the articulated basis for the reduction in hours was that there was low child attendance. And so there was a requirement across the board to identify individuals who should have their hours reduced and that they used as a factor that they had poor attendance problems. We think that should have probably been put in the second prong of the McDonnell-Douglas analysis that the employer has to come forward with evidence that there was a nondiscriminatory reason, that poor attendance is a nondiscriminatory reason for that. And there's a Ninth Circuit case law that's relatively on point with that, where there's a reduction in force, and the articulated basis for why a particular individual had their hours reduced or terminated was because of their performance problems or things like that. And those things were universally considered in the second prong of McDonnell-Douglas and the prong of had you identified a nondiscriminatory reason for the termination. We think that what essentially happened is, at least at the lower court, is the first and second prongs were conflated, that we – the burden was improperly placed on the plaintiffs to articulate the nondiscriminatory reason and then produce evidence to rebut it at the first phase. That really that becomes a nondiscriminatory reason. Kennedy, then let's just assume that you get over the prima facie case. Sure. Well, this is – and all that is is just nothing in the way of providing a framework for analyzing the claim, but let's assume we – and let's assume that the – that the – Assume I can get there? Well, let's assume that there was a legitimate nondiscriminatory reason that was offered. Sure. And we don't dispute that. Okay. So then where's the – what's the factual dispute that needs to be resolved by a jury? You're talking about what – our evidence that there was a pretext? Yes. Sure. We had a lot of evidence, actually. We had – we had evidence that the – that Tudor Time actually made false statements to the EEOC and to us in discovery about the reasons why the – why the plaintiffs had their hours reduced. And I'm happy to walk you right through them. Let's see. In the filings with the EEOC, Tudor Time did not articulate attendance at all as a basis for the reduction in hours. The EEOC asked for supplemental briefing. Attendance was not raised. You mean their – their attendance record or performance?  Correct. The plaintiff's attendance. Plaintiff's, you know, filed a complaint. Then – then the Tudor Time got a chance to respond. And when you look at the documents and their response, both to Amy and to Stacy, they did not articulate attendance as a reason for that. What did they say? They said scheduling, student enrollment, school needs, vacation, holiday, and or sick time utilized was the basis for – so they – they gave kind of five different – different things. But attendance, that low enrollment and attendance was not identified at that stage. They got a chance to supplement their EEOC, their EEOC response. Attendance not identified there. In their EEOC response, they initially claimed that the – that the plaintiffs did not have their hours in fact reduced. And through the course of discovery, it was determined, and they have admitted, that their hours were in fact reduced. They also claimed to the EEOC that Stacy voluntarily asked to be placed on call. And the manager of Tudor Time in her deposition admitted that that was a false statement to the EEOC. Tudor Time also claimed that they didn't even have an on-call listing in response to Amy Lesperon's EEOC complaint. And my assumption there is that the guy who drafted them didn't realize that Stacy and Amy would see each other's responses because in Stacy's, they admitted that she was placed on call. But in Amy's, they said on-call wasn't even a designation that existed. So initially, they claimed that low enrollment was the reason why they had to reduce everybody's hours. And we developed evidence that they actually hired six new teachers during that time, directly – it seems to directly contradict the idea that they had to reduce hours based on low enrollment. But the enrollment numbers show that there was a drop from, what, 240 down to about 185, something like that? That's correct. And that the effect of that was $10,000 a month reduction in revenue. That's correct. So we're – I think that there is – that is a nondiscriminatory reason for the reduction. It doesn't explain why only pregnant women had their hours reduced versus anybody else. And it also doesn't explain why they would hire six new teachers. And recall that this was on motion of presumably judgment. So we should have the inferences in our favor that the six new teachers contradicts the idea that the reasons their hours were reduced, they could have simply just not hired more new teachers if that was the requirement. So once we developed evidence that there were six new teachers hired – so that seems to create a fact dispute with respect to whether or not the low enrollment was the reason their hours was reduced – well, then they came back with, well, these teachers were hired to be in rooms that Amy and Stacey couldn't work in. Well, under oath, Ms. Colbert, the manager, she admitted that that was, in fact, not a true statement, that that was false, that there were rooms that the ladies could work in where these individuals were hired. They also, in an effort to justify how hiring six new teachers comports with the need to reduce hours, Ms. Colbert also identified that at least Stacey could not be in a particular room because one of the parents said that she didn't want her in there. We got a declaration from that parent that directly contradicted Ms. Colbert's testimony. There was also the regional manager, Bonnie Taylor, said in her deposition that if there was a restriction on the rooms that Ms. Smith could be placed in, there would be some documentation in the record of that, and no documentation exists. So we established a whole host of things, direct statements that were made by tutor time as to what the reason was. We – they admitted that several of them were false, and we produced evidence that they were – they were directly false. They made false statements. And we did – we did identify some case law in our brief at the end that simply engaging in – identifying false statements or engaging in a cover-up, but that is sufficient alone to create a jury question with respect to whether there's intentional discrimination based on their pregnant status. Roberts. Okay. Do you want to save the debate? Phillips. I would like to.  The rest of your time for rebuttal. Phillips. Thank you. Prinkevich. May it please the Court. Good morning. My name is Peter Prinkevich of Littler Mendelson for Tutor Time and Learning Care Group. I think it's important to start off by pointing out that the only adverse employment action at issue, and the only evidence of pregnancy discrimination, is a reduction in hours. So when we're – when the district court is looking at who is similarly situated, you have to look at who's outside the protected class, of course, number one. But number two, what issues are material here? And with respect to reduction in hours, you have to look at employees who are not pregnant and who had similar limitations on the hours that they could work, who had similar issues in terms of attendance, because that's what Tutor Time said. And they did say that consistently. If the Court looks at the submission to the Arizona Attorney General's Office, which is in evidence, it's Docket 42, and I think Exhibits 3 and 4. And like Mr. Curtis mentioned, we said hours are based on the needs of the facility, sick time, vacation, availability. It's always been based on availability, flexibility to work certain hours, and attendance in terms of dependability. So once there is a need to reduce hours, and that came from low enrollment, which was mentioned in the Attorney General's charge, and we've also provided the numbers which show a significant drop in July 2008 to 2009. Significant drop August 2008 to 2009. So who are you going to decide on who gets their hours reduced? We're going to look at dependability. We're going to look at availability. We're going to look at flexibility. And those are the things we look at. But to define similarly situated, whether it's for the prima facie case purposes or whether it's for pretext purposes. Our case law says that it doesn't take a whole lot for a plaintiff to meet his or her It does, Your Honor. In the court in 2010. One thing that caught my eye, I thought was kind of funny, was the memo from the manager to all staff saying we've got serious, we've got serious attendance problems in this place. Everybody. Everybody's got to get on board here. We need you at work. Yes. Well, and I think that's an important piece of evidence because we have a contemporaneous statement from the manager who said not everybody has attendance problems. It was addressed to everybody. It says you're all out of control with respect to wanting to switch shifts, request certain days off. And then she went on to say, and some of you, I'm going to be reviewing the records and some of you, because of your occurrences, are not going to have to worry about it because you're going to have a job, you're not going to have a job. And recall, Your Honor, that both plaintiffs were on final written warning for attendance problems right when the enrollment dropped. What's baffling to me is why wouldn't, why wouldn't that have been put into the response, the original response at EEOC then? Mr. Curtis points out that attendance, they listed a number of things, five things, but they didn't list attendance per se. I mean, I sort of agree with your read on the memo. It doesn't specifically talk about attendance. It says out of control with trading shifts. Well, that's not attendance. Leaving early, that's not attendance because you're there and you leave early. And then, and then wanting the same days off. And again, that's not attendance. But you say a big part of this was they were on final warning and so the complaint comes in from the EEOC. Why, why wouldn't you lead by saying, look, they've got big attendance problems here, and he says it's not there, and that's what creates the pretext issue? Well, I don't think that creates a pretext issue. First of all, to answer your question, I don't know why. They took the position that the hours weren't reduced. Meaning they're, and the reduction of hours is the adverse employment action. So I think it's important to distinguish, taking the position that there was no adverse employment action, because as the Court will see, and we, it's important to point out that there is an hours worked analysis in the record, Docket 42, Exhibit No. 6, that shows the hours for dozens of employees all throughout 2009. So that's the only evidence in the record of hours. But that shows that the plaintiff's hours fluctuated. In fact, there was no single period on that entire analysis where their hours were the same. And they were telling the EEOC, we worked 40 hours every week, then we reported our pregnancy, boom, we're down to 17. And so Tudor Time, in response, said their hours weren't reduced. And they submitted the hours. They weren't hiding anything. They said, here are the hours worked analysis. It fluctuates. And what does it fluctuate based on? Needs of the facility. Dependability. Availability. So they didn't say attendance, but when they said sick time, vacation, enrollment, I don't think they said enrollment. They said number of children, which is the same thing as enrollment. So these issues were out there right from the beginning. And I think what's critical is that counsel and judge, if I can interject a question, on the point you're just making, how can issues like that be resolved on a summary judgment? I mean, if they say our hours were reduced and the company's got other evidence that says, although they weren't, their hours were always, you know, this and that and changing, you know, why isn't that a factual issue that should go to be resolved by a fact finder? Well, because we're not contesting that right now, Your Honor. And it's because it's such a low standard that we're saying your hours were reduced. We concede that that's an adverse employment action. And now we're going to talk about why they were reduced. Because although I think it is important to point out, though, Your Honor, they don't have evidence on the hours that anyone else worked. We've provided it in our brief to the Court. We've said there are four pregnant employees. Two of them are the plaintiffs. One of them is Candace Vallick. One of them is Sherry Tinson. If the Court looks at that Exhibit 6 to Document 42, you'll see that Candace worked 40 hours a week all the way up until when she left to have her baby. And that was in the summer. I think it was in August. The Court will see that Sherry Tinson worked 70 hours every two pay periods until she requested in August to have her hours reduced. So when we have two pregnant employees who don't have dependability attendance problems, and we have two pregnant employees who have dependability scheduling and attendance problems, we can see two were treated one way, no reduction. Two were treated a reduction. It can't be because of pregnancy. That negates a finding of pretext. It negates a finding of discrimination because we have before us two other pregnant employees at the same time who didn't have their hours reduced. Well, that doesn't necessarily mean that there wasn't discrimination. Because you can point to some evidence that somebody who's in the protected class may not have suffered discrimination. It doesn't mean that the plaintiffs weren't discriminated against. But I think that's very strong evidence for you. Well, that may go, that may. Whether they can prevail on the merits is an entirely different question. But what they do need, Your Honor, is they need to show evidence. Well, what they needed to do here was, one, to meet their burden, to show that basically there's evidence to meet their prima facie case, require you to come back with a nondiscriminatory reason, and you did, and then they have an obligation to show that there's a genuine factual dispute that requires the matter to go before a fact finder. Now, whether they can prevail is a whole other question. And in order to meet that third prong and show that there's a genuine issue for dispute, they've got to come forward with evidence that similarly situated employees were treated differently. And we've pointed out, Judge, in our brief, relying on that Exhibit 6 workforce analysis, that there were nonpregnant employees who had their hours reduced compared to what they were in the summer. And so they don't have any evidence of hours that the other employees reduced. You notice when they say that they have two schedules. There's evidence in the record about what happened to other employees, correct? It doesn't make any difference whether they produced it or you produced it. No, Your Honor, they don't. I mean, there isn't any evidence. Right. I think that's what the district court was saying. There was no evidence of attendance issues on anyone else. There was no evidence of other hours that others worked. When they say that Candace Valek's hours were cut, they point to one schedule from one day in May. So your point is, is that if you were to look at the comparative group, nonpregnant employees, none of them had attendance problems? They haven't shown that evidence. That's what I'm saying. And that's exactly what Judge Wake said. He said now is the summary judgment time. Where is your evidence that this nonpregnant group had dependability problems? And they didn't have any. And so he had no choice. Counsel, let me ask you a question on that. You know, it seems to me that I agree with what Judge Pius said earlier. I was just speaking as one judge that the burden of showing a prima facie case in these types of cases is not is not all that high. So, I mean, we have to consider it. But let's just assume for a minute that what they've submitted comparing pregnant women versus nonpregnant women is enough to get there. And then the company has its legitimate reason. And it seems to me that the key issue here for us is whether there's a genuine issue of material fact on pretext. And that's what it boils down to. So, you know, if I'm right in that, the question in my mind is, why isn't it sufficient to have evidence that that's a legitimate reason of attendance was not given to the EOC in the submissions to the EOC? Why doesn't that raise an issue of fact just in itself? Put aside all this other stuff. Well, Judge, I think just because they didn't use the word attendance, when they said to the EEOC or the Arizona Attorney General's Office, based on sick time, vacation, those are availability and flexibility issues. And that's because, you remember, they took the position, Tudor Time, that the hours always fluctuate, and they're never the same, and they're always based on needs, and they're always based on enrollment. So that stuff, Your Honor, was all there in the response to the Attorney General's Office. Only in the most generalized sense, though. You say, you know, it's availability and flexibility, but it's much more specific in the case of these plaintiffs, because you say they were on their last legs. They'd gotten the last warning, and the warning was specific to attendance. You're not showing up. Not that you're asking to trade shifts. Not that you're leaving early. Not that you're not available for shifts. You know, you're not showing up when you're supposed to. I don't understand why they wouldn't have told the EEOC that specifically. And as Judge Gould points out, you know, the failure to say that on an earlier occasion maybe undermines the later assertion of that and raises a tribal issue of fact. But I don't know why they didn't say attendance. But it wasn't only attendance when I say flexibility and availability. I'm also talking about availability to work certain hours. There was a restriction for Stacey Smith. She couldn't work past 530. There was a restriction for Amy Lesbron. She couldn't work earlier. So that's part of the flexibility and availability as well. But that's not – there's no false inconsistent reason here. There was nothing false about the response. It just seems to crystallize later on. I mean, you're sort of hanging your hat that this wasn't pretextual on their bad attendance record and saying, look, this is what differentiates them from others. They had a terrible attendance record. And so, you know, we took that into consideration, determining where the reduction of force should be in place. But, you know, it's easy enough to articulate. I don't understand why the EEOC wasn't told that up front. That's, as I understand Mr. Curtis's point, that's the point. That came later. It didn't come at the outset. But the fact that the more specific attendance came later, and it's not only attendance that differentiates them from others. It is scheduling limitations as well. But the fact that attendance came later doesn't mean it's inconsistent. Now we're conceding. Let's not fight about whether hours were reduced because they fluctuated. They were reduced. Here's why they were reduced. Initially, they were saying, look, there's no – what plaintiffs are saying isn't true, that they went from 40 hours a week to 17. And you can see how the hours fluctuate. But what do you say, though, to his point? He says, look, the case law suggests that one basis for finding pretext or at least for raising an issue of pretext is to be tried to a trier of fact is inconsistency in the explanation. And he's saying we have that here. We don't have that here because it's Washington v. Garrett. It's fundamentally different justifications. It's not a fundamentally different justification.  We said to the EEOC, enrollment, availability, flexibility. Now that we've – yes, we've fleshed it out more by saying attendance, but it's not inconsistent. And that is the key, fundamentally different explanations. And we don't have that here. That's why we cited Aragon and we cited NIDS to show there's always one reason for needing to reduce hours or lay people off. And then there's always a second reason to show why are these people selected specifically. What do you do with counsel's comment during his argument that Tudor Time hired six new employees during the summer when they have this reduction in enrollment? What is that? What is that? Is that worth anything? No, because there was a reduction of enrollment. There's no dispute about that. But at the time, before she did it, Michelle Colbert in that July 13 memo said, I'm going to interview and hire. People who want to work every day, people who want to work their shifts, I'm going to do it. So even though there was a drop in enrollment, they were looking for more dependability, which gives even more credence to the idea of the employees who are less dependable would be the first to have their hours cut. Okay. Thank you, Your Honor. Thank you. I would just like to hit a couple points real quick. There is a Ninth Circuit case law that whether employees are similarly situated is a fact question, generally speaking. So I think on the first prong, there's that analysis. With respect to pretext, I mean, we identified that they made false statements about the reasons. Their manager admitted in her deposition that that's what happened. I think it's important to put it a little bit in chronological context. So I was the trial attorney. I did all the discovery. First, I get the EEOC report. It says, we didn't reduce your hours at all. You know, my clients tell me, that's crazy. We absolutely did have our hours reduced. So I think, okay, I need to develop some discovery that their hours were, in fact, reduced. So I proceed to do that. Okay. Then they say, well, their hours, yeah, they really were reduced, but the reason was just because of poor attendance or not because of lack of enrollment. So, okay, so I decided to do some discovery on that. And I find out that they, in fact, hired six new teachers. And I think, well, that seems inconsistent with the idea that they didn't have enough hours to go around for everybody. So then I'm taking the deposition of the manager, and I say, well, how do you explain that there are six new teachers hired? And she said, well, because those six new teachers were hired in places where these individuals couldn't work. And so I question her further, and she ultimately does admit in that same deposition that, no, that, in fact, was not true, that some of those people were hired in positions that my clients could work in. And then I ask her, well, I go through the memo with her, and I say, well, you say that you're going to do this and this and this. Are my clients the people that you're talking about? And she says, I do not recall. I do not recall. I do not recall. I don't know if your clients are going to. So I think, okay, what more could I do but ask the person who decided what happened? And then, for the first time in their motion for summary judgment, you get a declaration from her that says, here's the reason. It was because we had to reduce, and it was because of attendance issues. So from my perspective, I followed the chain. I followed their different reasons, and I did discovery on each one and disproved them. And only when discovery was over do I get this new justification, the one that Judge Wake's had on. And I think that's what the pretext analysis is, that if I have to follow each one and disprove every one, it essentially puts the burden on me to anticipate what their nondiscriminatory reason is and develop evidence to support it, where we know from McDonnell Douglas that, in fact, the second prong is they have the burden to prove that, and all I have to do is establish pretext. And we cited the case law that making absolutely, admittedly false statements about what the reason was, that gets me to a jury, I think. That's what we did here. I would note also that we did, I think, create a fact dispute about whether they even actually had attendance problems.  And we also created a fact dispute about the length of the absence policy that my clients didn't miss work for unexcused absences, that Tudor Time has a policy that if you're sick, you can't come to work for the obvious reason it's a preschool and preschools are virus incubators, and that they were actually in compliance with the Tudor Time policy of not coming to work when you're sick, and so the occurrences, their miss, were not unexcused absences. It wasn't these people were just not coming to work because they couldn't make it. It was because they were complying with the Tudor Time policy of not coming to work when you were sick. And so we think that that creates a fact dispute about whether or not they even had attendance problems. And then I would just like to focus on the idea that we didn't compare them to people who, to other non-pregnant teachers who had attendance problems, that we compared them to every other teacher in the school, and that we developed evidence and the manager admitted that by the end, they were the only teachers who were scheduled to work less than 20 hours a week. So we compared them to everybody else. And to the extent that there were other teachers with attendance problems, we did not compare them to them because we compared them to everyone. I don't know what else we really could have done in that regard. So unless you have any further questions, I don't think I have much to add. Roberts. No, thank you. I don't. I have no questions. Okay. Thank you, counsel. We appreciate your arguments and matters submitted at this time. He has a question.
judges: Burns, Gould, Paez